# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ENZO BIOCHEM, INC.  et al.,                    :

                Plaintiffs,                    :

      vs.                                              :          02-CV-8448 (RJS)
                                         ECF Case

AMERSHAM PLC, et al.,                          :

                Defendants,                    :

and                                                          :

YALE UNIVERSITY,                              :

                Nominal Defendant.  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# MEMORANDUM IN SUPPORT OF AMERSHAM'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................ 1

II.   BACKGROUND ................................................................................ 2

    A.   The Parties And Their Relevant History .............................................. 2

    B.   Enzo's Claims Against Amersham ...................................................... 4

    C.   Enzo's Multiple Opportunities For Discovery ....................................... 6

    D.   The Federal Circuit's Invalidity Ruling and This Court's Non-infringement Ruling ......................................................................... 8

III.  LEGAL STANDARDS ....................................................................... 8

IV.   ARGUMENT .................................................................................... 9

    A.   Enzo's Claim For Breach Of Contract (Count 1) ................................... 9

        1.   Enzo's breach of contract claim is time-barred. ........................... 9

        2.   Amersham had no contractual obligation as to products not listed on Exhibit B. ........................................................... 10

        3.   Amersham is entitled to summary judgment even under Enzo's interpretation of the term "PRODUCTS." ...................... 13

    B.   Enzo's Tort Claims ........................................................................ 13

        1.   Enzo's claim for tortious interference (Count V) is time-barred and fails on the merits. ...................................................... 13

        2.   Enzo's claim of fraudulent inducement of contract (Count VI) is time-barred and fails on the merits. ................................ 15

            a)   Enzo's fraud claim set forth in the Second Amended Complaint:  Amersham's alleged secret intention not to perform under the Agreement ............................ 15

            b)   Enzo's fraud theory belatedly set forth in its discovery response: Amersham's unsuccessful discussions with Yale ........................................... 17

3.      Amersham is entitled to summary judgment on Enzo's state
        unfair competition claim (Count III)..............................................................18

        a)      Enzo's unfair competition claim set forth in the
                Second Amended Complaint:  Amersham's
                decision not to enter into the amendatory agreement
                and relationship with ABI ..............................................................18

                (i)     Amersham's business decision not to enter
                        into the amendatory agreement with Enzo is
                        not unfair competition..........................................................19

                (ii)    Amersham's purchase of products from
                        PerkinElmer cannot constitute unfair
                        competition. ........................................................................20

        b)      Enzo's unfair competition claim belatedly set forth
                in its discovery response:  Amersham's
                unsuccessful discussions with Yale ...............................................21

        4.      Enzo's Lanham Act claim (Count IV) fails on the merits. .......................22

V.      GRANT OF THE PRESENT SUMMARY JUDGMENT MOTION WILL DISPOSE
        OF ALL OF ENZO'S CLAIMS AGAINST AMERSHAM ...................................... 23

VI.     CONCLUSION ......................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ABB Industrial Systems, Inc. v. Prime Technology, Inc.*,
   120 F.3d 351 (2d Cir. 1997).............................................................................9

*Adirondack Transit Lines, Inc. v. United Transporation Union*,
   305 F.3d 82 (2d Cir. 2002)..............................................................................10

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986).....................................................................................8, 9

*Baden Sports, Inc. v. Molten USA, Inc.*,
   556 F.3d 1300 (Fed. Cir. 2009)..................................................................22, 23

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986).........................................................................................8

*Century 21, Inc. v. Woolworth Co.*,
   181 A.D.2d 620, 582 N.Y.S.2d 101 (N.Y. App. Div. 1992) ...............................18

*Channel Master Corp. v Aluminium Ltd. Sales*,
   4 N.Y.2d 403, 151 N.E.2d 833 (1958)........................................................16, 18

*Cramer v. Devon Group, Inc.*,
   774 F. Supp. 176 (S.D.N.Y. 1991) ...................................................................16

*E-Z Bowz, LLC v. Professional Product Research Co.*,
   No. 00 Civ. 8670, 2003 WL 22068573 (S.D.N.Y. 2003) .....................................14

*Eagle Comtronics, Inc. v. Pico Products, Inc.*,
   256 A.D.2d 1202, 1203, 682 N.Y.S.2d 505 (N.Y. App. Div. 1998) .....................19

*Eaves v. Designs for Finance, Inc.*,
   785 F. Supp. 2d 229 (S.D.N.Y. 2011)...............................................................17

*Egan v. New York Care Plus Insurance Co. Inc.*,
   277 A.D.2d 652, 716 N.Y.S.2d 430 (N.Y. App. Div. 2000) .................................16

*Enzo BioChem, Inc. v. Applera Corp.*,
   599 F.3d 1325 (Fed. Cir. 2010).........................................................................8

*Eyal R.D. Corp. v. Jewelex New York Ltd.*,
   784 F. Supp. 2d 441 (S.D.N.Y. 2011)................................................................20

*Gordon v. Dino De Laurentiis Corp.*,

    141 A.D.2d 435, 529 N.Y.S.2d 777 (N.Y. App. Div. 1988) ...................................................16

*Greenlight Capital, Inc. v. GreenLight (Switzerland) S.A.*,
    No. 04 Civ. 3136, 2005 WL 13682 (S.D.N.Y. Jan. 3, 2005)...................................................21

*High Tides, LLC v. DeMichele*,
    88 A.D.3d 954, 931 N.Y.S.2d 377 (N.Y. App. Div. 2011) .....................................................18

*Hunter Douglas, Inc. v. Harmonic Design, Inc.*,
    153 F.3d 1318 (Fed. Cir. 1998)...............................................................................................20

*International Flavors & Fragrances, Inc. v. Royal Insurance Co. of America*,
    46 A.D.3d 224, 231, 844 N.Y.S.2d 257 (N.Y. App. Div. 2007) ............................................22

*Interpharm, Inc. v. Wells Fargo Bank*,
    655 F.3d 136 (2d Cir. 2011)....................................................................................................12

*Knight v. U.S. Fire Insurance Co.*,
    804 F.2d 9 (2d Cir. 1986).................................................................................................12, 19

*Lama Holding Co. v Smith Barney*,
    88 N.Y.2d 413, 668 N.E.2d 1370 (1996)..................................................................14, 16, 18

*Michel Cosmetics v. Tsirkas*,
    282 N.Y. 195, 26 N.E.2d 16 (1940).........................................................................................22

*Morgan v. A.O. Smith Corp.*,
    265 A.D.2d 536, 697 N.Y.S.2d 152 (N.Y. App. Div. 1999) ..................................................16

*National Life Insurance Co. v. Frank B. Hall & Co.*,
    67 N.Y.2d 1021, 494 N.E.2d 1021 (1986)................................................................................9

*Page v. Muze, Inc.*,
    270 A.D.2d 401, 705 N.Y.S.2d 383 (N.Y. App. Div. 2000) ..................................................16

*Police Conference of New York, Inc. v. Metropolitan Police Conference*,
    414 N.Y.S. 748 (N.Y. App. Div. 1979) ..................................................................................22

*Pursnani v. Stylish Move Sportswear, Inc.*,
    92 A.D.3d 663, 938 N.Y.S.2d 333 (N.Y. App. Div. 2012) ...................................................14

*Quarles v. General Motors Corp.*,
    758 F.2d 839 (2d Cir. 1985).....................................................................................................12

*Rogal v. Wechsler*,
    135 A.D.2d 384, 522 N.Y.S.2d 123 (N.Y. App. Div. 1987) ..................................................15

*Stull v. Bayard*,
    561 F.2d 429 (2d Cir. 1977)...............................................................................................15, 21

*TVT Records v. Island Def Jam Music Group,*
    412 F.3d 82, 91 (2d Cir. 2005)................................................................................16


**STATUTES**

15 U.S.C. § 1125(a)(1)(A) .......................................................................................22

15 U.S.C. § 1125(a)(1)(B) .......................................................................................23

N.Y. C.P.L.R. § 203(a) ...........................................................................................9

N.Y. C.P.L.R. § 203(g) .........................................................................................15

N.Y. C.P.L.R. § 213(2) ..........................................................................................19

N.Y. C.P.L.R. § 213(8) ..........................................................................................15

N.Y. C.P.L.R. § 214(4) ..........................................................................................14

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 56 .........................................................................8

Defendants Amersham plc and Amersham Biosciences (collectively "Amersham") respectfully request summary judgment of each remaining claim asserted by plaintiffs Enzo Biochem, Inc. and Enzo Life Sciences, Inc. (collectively "Enzo").

## I.    INTRODUCTION

This case -- pending now for more than ten years -- is ripe for resolution.  The Court has already decided Enzo's patent claim in Amersham's favor, granting summary judgment on September 21, 2012 that the accused Amersham products are non-infringing.  The Court should now resolve Enzo's ever-shifting, thinly plead, and baseless contract and tort claims.

Virtually all of the remaining claims can be resolved on statute of limitations grounds, an issue which can and should be adjudicated at this stage.  While Enzo claims breach of the parties' 1995 "distributorship agreement" (the "Agreement") (Ex. 1)[1], the alleged breaching activity occurred more than six years before it filed this action.  Similarly, Enzo asserts a number of tort claims, which turn on activities that occurred prior to the various relevant limitations periods.

Even if the Court were to reach the underlying merits of the claims, they can be readily disposed of on summary judgment.  Enzo's breach of contract claim fails under the unambiguous language of the Agreement, particularly the defined term "PRODUCTS."   The Agreement makes abundantly clear that the term "PRODUCTS," and Amersham's obligations relating thereto, are limited to the products specifically listed on Exhibit B to the Agreement.  Enzo's argument -- that Amersham owed and then breached unspecified obligations related to products nowhere listed on Exhibit B or elsewhere in the Agreement -- thus fails as a matter of law.

Enzo's tort claims are similarly legally flawed.  These claims have been a moving target throughout the litigation as Enzo has alleged as tortious conduct certain types of business activities in which companies routinely engage and which lack essential elements of the asserted claims.  Such claims cannot withstand the scrutiny of summary judgment.

---

[1] Except where otherwise noted, exhibits referenced herein are attached to the Declaration of Matthew M. Wolf in Support of Amersham's Motion for Summary Judgment.

## II.    BACKGROUND

### A.    The Parties And Their Relevant History

In the early 1980s, Enzo licensed certain patent rights from Yale University relating to indirectly detectable labeled nucleic acids.  The licensed patents were based upon a single application filed in 1980 by Dr. David Ward and other individuals at Yale University (the "Ward patents").[2]  In the 1990s, Enzo entered into a series of what it termed "distributorship" agreements with a number of companies, including with Amersham in February of 1995, relating to the Ward patents and some additional Enzo-owned patents.  Enzo insisted that Amersham enter into this type of agreement -- rather than a license -- presumably so that Enzo could minimize its royalty obligations to Yale University by taking the position that the money that Enzo received from Amersham was "manufacturing revenues" rather than royalties to which Yale would be entitled to a share.[3]

The negotiations took several months, during which time Enzo sought to define the term "PRODUCTS," subject to obligations under the Agreement, expansively to include any technology covered by the patents set forth on Exhibit A to the Agreement.  (See Ex. 9 (Feb 10, 1995 Draft Agreement (E2831)).)  Amersham, however, successfully insisted that the "PRODUCTS" be limited with reference to specific products as listed on Exhibit B.  (See Ex. 10 (2/8/1995 Fax (E22588)) ("Products should be defined by reference to the agreed specifications.").)  The Agreement was finalized on February 21, 1995.  Under its plain and

---

[2]The Ward patents include U.S. Patent Nos. 4,711,955; 5,328,824; 5,449,767; and 5,476,928, each of which expired in 2004.  The subject matter of the Ward patents was developed pursuant to grants awarded by the National Institute of Health ("NIH").  The license to Enzo was subject to the requirement, imposed by NIH, that the Ward technology would be made available to others on commercially reasonable terms.  (Ex.2 (E00031976.))  Specifically, the Yale license agreement provided Enzo with the ability to enter into sub-licenses to make the Ward technology commercially available.  (Ex. 3 (Yale License) ¶ 11).)  In the years that followed, however, Enzo almost invariably refused to enter into any such sublicenses with respect to the Ward technology.  Indeed, it announced to others in the industry that it had a firm policy against such licensing.  (Ex. 4 (facsimile from Enzo stating "It is not Enzo's policy to grant a license or to collect a royalty for products that fall within the scope of our patents."); Ex. 5 (Long Dep.) at 51:6-23 (noting industry recognition of Enzo policy).)

[3] Although styled a "distributorship agreement," the Agreement permitted Enzo to ask Amersham "to manufacture certain products on behalf of Enzo."  (Ex. 1 (Agreement) ¶ 26.)  In fact, Amersham already had been and, after entry of the Agreement, continued to manufacture the PRODUCTS that it was nominally purchasing from Enzo.  (Ex. 6 (1995 fax from Ernst & Young to Enzo); Ex. 5 (Long Dep.) at 90; Ex. 7 (Engelhardt Dep.) at 345; Ex. 8 (Thalenfeld Dep.) at 195.)  Under the terms of the Agreement, Amersham would thus "purchase" the goods that it manufactured -- for the extortionate royalty rate of 45% of the selling price of the products -- despite the fact that Amersham bore the manufacturing, research, development, marketing and sales cost for such products.

unambiguous language, the only products that are subject to obligations under the Agreement are those expressly identified in Exhibit B thereto:

- "PRODUCT means an individual reagent or combination of reagent (kit) that are, individually or combined, covered by ENZO PATENTS . . . *as listed in EXHIBIT B.*"  (Ex. 1 at 1 (emphasis added).)

- "PRODUCTS covered by this agreement *are listed in Exhibit B attached hereto.*" (*Id.* ¶ 3.1 (emphasis added).)

Exhibit B (which is five pages long) lists 36 Products by name and catalog number, provides a short description of each, and gives individual "transfer prices" to be paid to Enzo by Amersham. Further, the Agreement specifically mandates that additional Products can only be made subject to its terms by mutual consent of the parties:  "Both Enzo and Amersham must agree to additions to, deletions from or modifications of PRODUCTS in Exhibit B before such additions, deletions or modifications are incorporated here." (*Id.* ¶ 3.2.)  At no time did the parties agree that any other products would be added to Exhibit B.

Several months after signing its Agreement with Enzo in February of 1995, Amersham acquired Biological Detection Systems ("BDS"),[4] and, as a result of this acquisition, began marketing and selling directly detectable cyanine dye-labeled nucleotides ("CyDye" products).[5] The CyDye technology was developed in the mid-1980s by Alan Waggoner at Carnegie-Mellon University, and Amersham eventually obtained the exclusive license to this technology.  (Dkt. 161 (Burczak Decl.) ¶ 12.)  Amersham also began selling certain alkaline phosphatase products and sequencing kits and components (referred to as ThermoSequenase).  The ThermoSequenase technology was licensed from Harvard University in 1994 and developed into products at Amersham.  (*Id.* ¶ 25.)  None of these CyDye, alkaline phosphatase or sequencing kit-related

---

[4] (*See* Ex. 11 (4/26/1995 Fax from Alan W. Seadler to Rabbani (AM005045)).)

[5] *See id.*  At the time of the acquisition, BDS was purchasing certain cyanine dye-labeled nucleotides from NEN Life Sciences, which was subsequently acquired by PerkinElmer Life Sciences, Inc. ("PerkinElmer").  (*See* Dkt. 161 (Burczak Decl.) ¶¶ 12, 28.)  Several years later, in January 1999, PerkinElmer also entered a distributorship agreement with Enzo and subsequently became a defendant in a related case brought by Enzo and pending before this Court.  (*See* Ex. 39 and Dkt. 70 ¶¶ 1, 12.)

products were listed in Exhibit B to the Agreement, and they never became part of the Agreement.  (*See* Ex. 1 (Agreement) at Tab B.)

Enzo knew of Amersham's sale of products outside the scope of the Agreement, *i.e.*, not on Exhibit B thereto, by at least early 1996.  Indeed, it notified Amersham of this fact in January 1996.  (Ex. 12 (1/12/1996 Fax from Rabbani to Michael Evans (E23009)).)  Amersham and Enzo representatives met to discuss the issue early that same year.  (Ex. 13 (Rollins Dep.) at 221-22.)  The parties tried unsuccessfully to resolve their dispute for several years in the form of a draft amendatory agreement, which, if ultimately entered, would have expanded the Agreement to include CyDye, alkaline phosphatase and sequencing kit-related products.  (Ex. 14 (8/7/1998 Letter from Long to Rabbani (AM005727)).)  However, the parties disagreed about key provisions of the draft amendatory agreement, including significantly Enzo's insistence that Amersham cease its own research efforts.  (*Id.*; Ex. 15 (4/6/1999 Fax from Rabbani to Evans (AM005729-31)); Ex. 18 (2/27/2001 Letter from Long to Rabbani (AM006001)).)  The parties' negotiations broke off in July of 2001.  (Ex. 19 (AM 006180)).  Enzo did not file the present suit until October of 2002, more than six years after Enzo learned of Amersham's sale of products outside the scope of the Agreement.[6]  (*See* Ex. 12 (1/12/1996 Fax from Rabbani to Michael Evans (E23009)); Dkt. 1.)

### B.    Enzo's Claims Against Amersham

Enzo's original complaint was filed in October 2002 against several defendants, many of whom had separate agreements with Enzo.  (Dkt. 1 (Original Compl.); Second Am. Compl. ¶¶ 1, 2. (Ex. 39 and Dkt. 70).)  Judge Sprizzo -- who presided over the litigation until his passing -- ordered Enzo to file a separate case for each defendant.  (Ex. 39 and Dkt. 70 ¶ 1.)  Enzo's present claims against Amersham are set forth in its Second Amended Complaint, filed May 27, 2003.  Count I is the primary non-patent claim.  It alleges that Amersham breached the parties' Agreement by engaging in certain activities with respect to products that were not listed on

---

[6] In 2003, Amersham terminated the Agreement.  (*See* Ex. 39 and Dkt. 70 ¶ 55.)

Exhibit B, including specifically the following categories of products: "(i) conjugated alkaline phosphatase products and detection systems"; (ii) "cyanine labeled nucleotides"; and (iii) "sequencing kits and sequencing kit components." (*Id.* ¶ 58.)

The remaining non-patent claims are set forth in Counts III through VI. Count III alleges that Amersham engaged in "unfair competition in the conduct of trade and commerce" under New York common law; Count IV asserts that Amersham engaged in unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); Count V claims that Amersham is liable for tortious interference with business relations between Enzo and PerkinElmer; Count VI alleges that Amersham engaged in fraud in the inducement of the Agreement, in violation of New York common law. (*Id.* ¶¶ 71-97.)

Enzo's patent claim against Amersham is set forth in Count II. (*Id.* ¶¶ 64-70.) The Count references nine patents, four of which are the Ward patents licensed from Yale University. (*Id.* ¶ 65.) Early in the litigation (in December 2002), Amersham served an interrogatory seeking detailed infringement contentions, including a claim chart, and repeatedly sought a complete answer from Enzo. (Ex. 20 (Amersham's First Set of Interrogatories) at No. 18.) In 2005, Judge Sprizzo made clear that Enzo was obligated to complete its response to this interrogatory before the parties engaged in claim construction proceedings. (Ex. 21 (2/7/2005 Hrg. Tr.) at 10 ("I will suggest, if there's going to be amended answers to interrogatories previously [served], it be done in 30 days from now. Then after, I will not entertain anything further. And any changes to interrogatory answers, I have to know for my own benefit what I'm going to be asked to resolve."); Ex. 22 (3/4/2005 Hrg. Tr.) at 4-13.) At the time of the *Markman* proceedings in mid-2005, the only patents specifically asserted against Amersham were three of the Ward patents (*i.e.,* the '928, '824 and '767 patents) and the Enzo-owned '373 and '269 patents.[7] (Ex. 23 (3/9/2005 Amended Resp. to Amersham Interrogatory No. 18) at Claim Charts pp. 1-20.)

---

[7] Enzo contended at that time that three other patents were "asserted" against Amersham. However, it did not (and apparently could not) identify any Amersham products that were alleged to infringe such patents, which plainly raised Rule 11 issues. (*See* Ex. 23 (3/9/2005 Amended Resp. to Amersham Interrogatory No. 18) at pp. 1-2.)

Judge Sprizzo indicated that he viewed the case as a patent case, ultimately providing Enzo with a Rule 11 warning as to its non-patent claims.  (Ex. 24 (7/18/2007 Hrg. Tr.) at 299 ("If you're not going to make out your infringement claim, you're not going to get anything here. . . . a lot of [the non-patent claims] look to me like junk claims."); *id.* at 307 ("I'm giving you your Rule 11 notice now.  Now maybe I can never persuade you except to start telling you what I'm going to have to do at the end of this case if you do not make a good faith effort to get rid of the junk claims, all right?").)  He also cautioned Enzo that it would not be permitted to assert theories that were not contained in Enzo's complaint.  (*Id.* at 281-82 ("[The] [p]leading sets forth your claim.  You can't just go and say breach of contract and then argue every possible breach of contract you can think of at the time of trial. . . .  Otherwise, we'd have no purpose to seek leave to amend if you could just amend willy nilly a pleading . . . ."); *id.* at 312 ("It's not what you argue, it's what's in your complaint.").)

### C.   Enzo's Multiple Opportunities For Discovery

Enzo had lengthy and multiple opportunities to conduct discovery in this case.  From the filing of its original complaint in October of 2002 until the May 2005 fact discovery cutoff, Enzo was afforded more than two years to conduct its discovery.  Enzo sought and received an extensive document collection from Amersham.  Enzo also deposed numerous Amersham-affiliated individuals and 30(b)(6) witnesses before the fact discovery cut-off date.

After receipt of the Court's claim construction ruling in June of 2006, Amersham and defendants in the other related cases indicated their intention to move for summary judgment on all counts.  In response, Enzo sought additional document discovery from Amersham with the apparent goal of adding to or amending its infringement contentions in contravention of the Court's prior ruling.  As Amersham explained to Enzo at the time, even if such products had been timely accused in the case, Amersham had already produced the documents in its possession.  (Ex. 25 (9/12/2006 letter from M. Wolf to R. Chern); *see also* Ex. 26 (3/5/2007 letter from A. Whiting to R. Chern).)

On October 26, 2006 -- more than four years after the case was filed, more than a year after the fact discovery cutoff and after the parties had appeared for at least **twenty** different hearings -- Enzo first raised before Judge Sprizzo a purported discovery dispute with Amersham, requesting "spec sheets" and "product descriptions" for certain products for which it had never provided timely infringement claim charts.  Judge Sprizzo stated:

> We are not going to start the ball anew or the ball rolling again every time [Enzo's counsel] comes up with a new theory.  There has got to be an end to discovery. . . . At this stage of the case after I have expended the time and effort, and a considerable amount of time on the Markman hearing and writing an opinion, right or wrong, I am not about to have the theory of the case shift to new items and new claims that were not asserted in the original complaint or that were not part of the Markman hearing.

(Ex. 27 (10/26/2006 Hrg. Tr.) at 24-25.)  After Enzo's counsel asserted that it should be entitled to "take th[e] claim construction [order] and go back and . . . look at [Amersham's] products to see what is encompassed and . . . come up with new products that we find," the Court disagreed, stating that Enzo would have to "file a new complaint."  (*Id.* at 25.)[8]

At that same hearing, Judge Sprizzo granted permission for Amersham and the related defendants to file a joint summary judgment motion on patent issues and for each defendant to file a separate summary judgment motion on non-patent issues.  Judge Sprizzo also afforded Enzo a five month period -- between the filing of the summary judgment motions in January 2007 and Enzo's opposition in May of 2007 -- to conduct any additional discovery for purposes of opposing the motions.  Enzo obtained further discovery from Amersham during the second discovery window, including by deposing Amersham's fact declarant, who had set forth in his declaration technical details about the Amersham products accused of infringement.  Despite Judge Sprizzo's invitation, Enzo never raised any further discovery disputes relating to Amersham's individual summary judgment motion.  (*See* Ex. 27 (10/26/2006 Hrg. Tr.) at 18-20 ("If you disagree with his choice [of discovery], come to me.  I will be here . . . .").)

---

[8] Enzo asserted at the November 16, 2012 hearing that the parties had previously agreed to conduct discovery through trial, referencing statements from a 2005 hearing.  The discussion it cited was in the context of depositions that had been scheduled prior to the close of fact discovery but not yet been completed.  (*See* Ex. 28 (5/21/05 Hrg. Tr.) at 8-9.)

**D.     The Federal Circuit's Invalidity Ruling and This Court's Non-infringement Ruling**

On March 26, 2010 and September 21, 2012, the Federal Circuit and this Court, respectively, issued rulings that resolved Enzo's patent claim (Count II).  First, the Federal Circuit affirmed an invalidity judgment as to one of the Ward patents -- the '928 patent -- which had been invalidated on summary judgment by Judge Arterton in the District of Connecticut in litigation Enzo filed against another defendant.  *See Enzo BioChem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1340 (Fed. Cir. 2010).  Subsequently, this Court permitted Amersham and the related defendants to re-file their joint summary judgment motion on patent non-infringement issues.  Amersham thus moved for summary judgment of non-infringement for every product that Enzo had: (1) specifically accused of infringing (other than the invalidated '928 patent) in compliance with Judge Sprizzo's earlier orders, and (2) not withdrawn from its infringement contentions.  The Court granted the summary judgment motion as to the accused Amersham products.  (Dkt. No. 280).  Thus, these rulings have disposed of Count II in its entirety and, should the Court grant the present motion, it will dispose of each of Enzo's remaining claims against Amersham.

**III.     LEGAL STANDARDS**

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and [] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In deciding such a motion, the Court must view all facts and draw all inferences in the light most favorable to the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The Court also must scrutinize the evidence proffered by the non-moving party to determine if it raises a genuine issue of material fact.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Id*. at 249-50 (citations omitted).

## IV.    ARGUMENT

### A.    Enzo's Claim For Breach Of Contract (Count 1)

Summary judgment is appropriate on Enzo's breach of contract claim on several independent grounds.  *First,* Enzo's claim is time-barred.  *Second,* none of the products identified in Enzo's complaint are "PRODUCTS" subject to obligations under the Agreement, which are listed on Exhibit B thereto.  *Third,* even under Enzo's interpretation of the Agreement (*i.e.,* "PRODUCTS" includes any products that infringe a patent listed on Exhibit A to the Agreement even if not listed on Exhibit B), the non-listed products are free from any contractual obligations in view of the Court's September 21, 2012 ruling (Dkt. 280), granting summary judgment of non-infringement in Amersham's favor.

### 1.    Enzo's breach of contract claim is time-barred.

There is no genuine dispute that Enzo's breach of contract claim is time-barred under the applicable statute of limitations.  An action upon a contractual obligation or liability must be commenced within six years of the accrual of the cause of action.  N.Y. C.P.L.R. §§ 203(a); 213(2).  The statute of limitations begins to run from the moment of breach, not from alleged discovery thereof.  *See ABB Indus. Sys., Inc. v. Prime Tech., Inc.*, 120 F.3d 351, 360 (2d Cir. 1997) ("in New York it is well settled that the statute of limitation for breach of contract begins to run from the day the contract was breached, not from the day the breach was discovered, or should have been discovered.") (citing *Ely-Cruikshank Co. v. Bank of Montreal*, 81 N.Y.2d 399, 402-04 (1993); *National Life Ins. Co. v. Frank B. Hall & Co.*, 67 N.Y.2d 1021, 1023-24 (1986) (superseded by statute on other grounds).)

Here, Amersham was marketing and selling cyanine dye-labeled nucleotides and other fluorescent probes in 1995.  (Ex. 29 (2/10/1998 Letter from Long to Rabbani (AM005737)).) Enzo itself clearly knew of Amersham's sale of products outside the scope of Exhibit B at least as early as 1996.  (Ex. 12 (1/12/1996 Fax from Rabbani to Evans (E23009)).)  Indeed, it notified Amersham of the fact in January of 1996 and Amersham and Enzo met early in 1996 to discuss the issue.  (*Id.*; Ex. 13 (Rollins Dep. at 221-22).)  Because this action was not filed until late

October of 2002 -- more than six years later -- Enzo's claim for breach of contract is precluded by the statute of limitations.

　　　　2.　　**Amersham had no contractual obligation as to products not listed on Exhibit B.**

　　　　Even if Enzo's breach of contract claim were not time-barred, it nonetheless fails as a matter of law because it is based upon an unsustainable interpretation of the defined term "PRODUCTS."  The only contractual obligations that Amersham owed Enzo were for products that fell within the scope of the defined term "PRODUCTS" in the parties' Agreement.  The Agreement repeatedly makes clear that "PRODUCTS" were limited to those specifically set forth on Exhibit B to the Agreement.  According to Enzo, however, Amersham owed Enzo contractual obligations -- and violated such obligations -- based upon Amersham's sales and marketing activities for products nowhere listed on Exhibit B or anywhere else in the Agreement.  Because this dispute turns on the meaning of the unambiguously defined term "PRODUCTS," it is amenable for resolution on summary judgment.  *See Adirondack Transit Lines, Inc. v. United Transp. Union,* 305 F.3d 82, 85 (2d Cir. 2002) ("The proper interpretation of an unambiguous contract is a question of law for the court, and a dispute on such an issue may properly be resolved by summary judgment.") (quotation and citation omitted).

　　　　Here, the meaning of "PRODUCTS" is readily discernible and limited to those products set forth on Exhibit B in light of several provisions in the Agreement.  For example, the Agreement states that "PRODUCT means an individual reagent or combination of reagents (kit) that are, individually or combined, covered by ENZO PATENTS … ***as listed in EXHIBIT B***" and that "PRODUCTS covered by this agreement ***are listed in Exhibit B attached hereto***." (Ex. 1 ¶ 3.1 (emphasis added).)  And, even if these provisions were not already sufficiently clear (which they are), the Agreement specifically mandates that other products cannot be made subject to the terms of the Agreement except by mutual consent of the parties:  "Both Enzo and Amersham must agree to additions to, deletions from or modifications of PRODUCTS in Exhibit B before such additions, deletions or modifications are incorporated herein."  (*Id.* ¶ 3.2.)  It is

undisputed that the parties never agreed to any modification of Exhibit B.  Thus, Enzo's breach of contract theory -- *i.e.*, that Amersham breached the Agreement by engaging in various activities with respect to products not listed on Exhibit B -- fails as a matter of law.

Enzo's impermissible reading of the Agreement is similarly fatal to its claim that Amersham breached the Agreement by "manufacturing and selling products to others for non-research purposes and/or for commercial development and exploitation" in violation of section 1.2(e) of the Agreement.  (Ex. 1 ¶ 38.)[9]  The only fact that Enzo pointed to in support of its allegation of breach of section 1.2(e) is Amersham's sales of CyDye products, which are not on Exhibit B and thus not part of the Agreement.  (Ex. 30 (Enzo's Response to Amersham's 2nd Set of Interrogatories) at No. 4.)  Thus, once again, these products are not subject to any obligations under the Agreement.

Late in discovery (after having served no fewer than three complaints), Enzo impermissibly tried to amend its breach of contract claim by asserting, in a supplemental interrogatory response, new theories that had not previously been disclosed.  Enzo never sought leave to amend its pleading to include these new allegations, as Judge Sprizzo made clear would be required.  (Ex. 24 (7/18/2007 Hrg. Tr.) at 281-82; *id.* at 312.)

Even if these new theories were properly before the Court, however, they would fail as a matter of law.  First, Enzo belatedly asserted that Amersham was not allowed to make or sell other technology -- that is to say, products not listed on Exhibit B -- in the field without Enzo's permission.  (Ex. 30 (Enzo's Responses to Amersham 2nd Set of Interrogatories) at 6.)  This reading is flatly contradicted by the plain text of the Agreement, which imposes no requirements for products other than those on Exhibit B.  Indeed, Enzo's corporate representative Dr. Dean Engelhardt, identified as one of two most knowledgeable people at Enzo concerning the Agreement, could not identify a single contractual provision in support of Enzo's position that

---

[9] That section provides as follows "AMERSHAM agrees … that all PRODUCTS sold by AMERSHAM are for research use only and are not intended to be used for diagnostic or therapeutic purposes." (Ex. 1 § 1.2(e).)

Amersham was prohibited from making or selling products not listed on Exhibit B.  (Ex. 7 (Engelhardt Dep.) at 368-369.)

Any attempt to read in any extra-contractual restrictions on Amersham should be rejected in light of the Agreement's merger/integration clause:

> THIS AGREEMENT together with the EXHIBITS attached hereto embodies the entire understanding between AMERSHAM and ENZO, and there are no contracts or prior drafts of the agreement, understandings, conditions, warranties or representations, oral or written, express or implied, with reference to the subject matter hereof which are not merged herein.[10]

Merger clauses such as the one in the Agreement are conclusive evidence as to what is included in (and excluded) from an agreement.  *See, e.g., Interpharm, Inc. v. Wells Fargo Bank,* 655 F.3d 136, 145 (2d Cir. 2011) ("The purpose of a merger clause is to require the full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to alter, vary or contradict the terms of the writing.") (quoting *Jarecki v. Shung Moo Louie,* 95 N.Y.2d 665, 669, 722 N.Y.S.2d 784, 786, 745 N.E.2d 1006 (2001)).

Second, Enzo belatedly argued that Amersham breached the Agreement by failing to use "best efforts" to promote sales of Enzo "PRODUCTS" in violation of section 8.1 of the Agreement.  (*See* Ex. 30 (Enzo's Response to Amersham's Second Set of Interrogatories) at No. 4.)  However, as required under this Agreement, Amersham made the Exhibit B products available to consumers, by listing them in Amersham's catalogs and including them in Amersham's marketing and promotional activities.  (Ex. 5 (Long Dep.) at 80.)  There simply is no evidence that Amersham failed to market the Enzo products in the same manner in which it marketed its other products.  *See Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (a party cannot rely on bare allegations to defeat summary judgment); *see also Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985) ("mere conjecture or speculation by the party resisting summary judgment does not provide a basis upon which to deny the motion.").

---

[10] (Ex. 1 § 22.1.)

**3.**    **Amersham is entitled to summary judgment even under Enzo's interpretation of the term "PRODUCTS."**

Even if the Court were to adopt Enzo's proposed interpretation of the term "PRODUCTS," Amersham would nevertheless be entitled to summary judgment on Enzo's breach of contract claim.  Throughout the litigation, Enzo has asserted that the defined term "PRODUCTS" includes any products that infringe the patents as set forth on Exhibit A, regardless of whether or not they are listed on Exhibit B.  (*See, e.g.,* Enzo's 5/15/2007 Opp. To Amersham's Mot. for Summary Judgment at 4.)  While Enzo's position is flatly contradicted by several provisions of the Agreement, the Court's patent summary judgment ruling disposes of the contract claim even under Enzo's interpretation of the Agreement.  The Court granted summary judgment of non-infringement in Amersham's favor on each Amersham product that was timely accused of infringement.  Thus, even under Enzo's interpretation of the Agreement, there are no non-listed products that could be "PRODUCTS" subject to any contractual obligations.

Accordingly, under either parties' interpretation of the term "PRODUCTS," summary judgment should be entered in Amersham's favor.

**B.**    **Enzo's Tort Claims**

Perhaps cognizant of the insurmountable flaws in its patent and contract claims, Enzo also asserted a number of tort claims in the apparent hope of reaching a jury.  Nearly all of Enzo's tort claims -- like its breach of contract allegations -- are precluded by the applicable statutes of limitations.  The tort claims concern events that happened in the mid-1990s, and the undisputed evidence shows Enzo waited too long to bring such claims.  Moreover, even if the tort claims were not time-barred, they would still be legally unsustainable.

**1.**    **Enzo's claim for tortious interference (Count V) is time-barred and fails on the merits.**

Enzo claims, on information and belief, that Amersham engaged in "tortious interference" with Enzo's business relationship with PerkinElmer Life Sciences, Inc. ("PerkinElmer'), who also entered into a distributorship agreement with Enzo in 1999. Amersham allegedly committed this tortious interference by purchasing cyanine dye-labeled

nucleotides from PerkinElmer, conduct that began well *before* Enzo signed its distribution agreement with PerkinElmer.

The statute of limitations for tortious interference with business relations is three years. *See* N.Y. C.P.L.R. § 214(4) (McKinney 2003); *Pursnani v. Stylish Move Sportswear, Inc.*, 92 A.D.3d 663, 664, 938 N.Y.S.2d 333 (N.Y. App. Div. 2012) (collecting cases). It is incontrovertible that Enzo knew of Amersham's purchase of cyanine dye-labeled nucleotides from PerkinElmer by at least July of 1999 (*see* Ex.32 (7/23/99 Letter from Rabbani to Long (AM004639-40))), yet Enzo did not file suit until October of 2002, more than three years later. Enzo's tortious interference claim is thus time-barred.

Even if the claim were not time-barred, it fails as a matter of law because Enzo has not pled facts that satisfy the elements of the claim. To prove tortious interference, the plaintiff must show not only the existence of a contract or business relationship between the plaintiff and a third party, but also *intentional* interference with that contract and/or those relations by the defendant. *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424, 668 N.E.2d 1370 (1996); *see also E-Z Bowz, LLC v. Prof'l Prod. Res. Co.*, No. 00 Civ. 8670, 2003 WL 22068573, at *36 (S.D.N.Y. 2003). The evidentiary burden for plaintiff is high, especially as to Amersham's intent. Enzo must establish that Amersham knew of the contract allegedly interfered with, that PerkinElmer actually breached the contract, and that Amersham intentionally "procured" that breach, as well as prove damages. *See Lama Holding Co.*, 88 N.Y. 2d at 424.

Enzo cannot, and could never, prove this claim because, among other things, Enzo cannot show that Amersham's intent in purchasing cyanine dye products from PerkinElmer was to interfere with Enzo's contractual relationship with PerkinElmer. (*See* Dkt. 161 (Burzcak Decl.) ¶¶ 12, 28.) Amersham's purchase of cyanine dye-labeled nucleotides from PerkinElmer indisputably *predates* PerkinElmer's distributorship agreement with Enzo. Amersham's relationship with PerkinElmer stems from its acquisition of Biological Detection Systems ("BDS") in 1995, at which point BDS was already purchasing cyanine dye-labeled nucleotides

14

from PerkinElmer.  (Ex. 11 (4/26/1995 Fax From Alan W. Seadler To Rabbani).)
PerkinElmer's distributorship agreement with Enzo, on the other hand, was not entered until
years later -- on January 1, 1999.  (Ex. 33 (Enzo/NEN Settlement Agreement).)  If anything, it
was Enzo who attempted to interfere with Amersham's pre-existing relationship with
PerkinElmer and not the other way around.

> ### 2. Enzo's claim of fraudulent inducement of contract (Count VI) is time-barred and fails on the merits.

Enzo also asserts that Amersham "fraudulently induced" it into entering the parties'
Agreement, the basis of which has been a moving target throughout the case.  Regardless of the
theory upon which Enzo seeks to proceed, the claim is also time-barred and legally deficient.

> ### a) Enzo's fraud claim set forth in the Second Amended Complaint:  Amersham's alleged secret intention not to perform under the Agreement.

The only fraud theory properly pled in this case is that Amersham purportedly and
fraudulently induced Enzo into entering into the Agreement by representing that Amersham
would abide by the terms of the contract and then breached the contract by selling products not
listed in the Agreement that allegedly infringed Enzo patents, *e.g.*, cyanine dye-labeled
nucleotides and fluorescent probes.  (Second Am. Compl. (Ex. 39 and Dkt. 70) at ¶ 93.)

This claim is time-barred.  A cause of action for fraud must be brought within six years
from the conduct at issue (the longest permissible period under the statute) or within two years
from the plaintiff's discovery of it, whichever is longer.  *See* N.Y. C.P.L.R. 213(8); *Stull v.
Bayard*, 561 F.2d 429, 432 (2d Cir. 1977); *see also* N.Y. C.P.L.R. § 203(g).  A cause of action
for fraudulent inducement arises, for statute of limitations purposes, at the time of execution of
the contract.  *See Rogal v. Wechsler*, 135 A.D.2d 384, 522 N.Y.S.2d 123 (1st Dept 1987).

Amersham and Enzo executed the Agreement in February of 1995, and it cannot be
disputed (as detailed above) that Enzo learned of Amersham's sale of cyanine dye-labeled
nucleotides and fluorescent probes in at least January of 1996.  (Ex. 12 (1/12/1996 Fax from
Rabbani to Michael Evans (E23009)).)  Enzo, however, did not bring its fraudulent inducement

claim until late October 2002.  (Dkt. 1.)  Thus, whether Enzo seeks to invoke the six-year statute of limitations based on the timing of the alleged fraudulent conduct (the execution of the Agreement) or the two-year statute of limitations based on its discovery of Amersham's sales of cyanine labeled dyes, the claim is barred under the applicable statute of limitations.

Even if it were not time-barred, this theory of fraudulent inducement is not legally cognizable.  Enzo attempts to transform its breach of contract claim into an additional claim for fraud based on allegations of a secret intention on the part of Amersham not to comply with the terms of the Agreement.  Under settled principles of common law in New York, there is a clear distinction between a cause of action for breach of contract and one based on fraud; a cause of action seeking damages for fraud simply cannot be sustained when the only fraud charged relates to a breach of contract.  *Egan v. New York Care Plus Ins. Co. Inc.*, 277 A.D.2d 652, 716 N.Y.S.2d 430 (N.Y. App. Div. 2000); *Page v. Muze, Inc.*, 270 A.D.2d 401, 705 N.Y.S.2d 383 (N.Y. App. Div. 2000); *Morgan v. A.O. Smith Corp.*, 265 A.D.2d 536, 697 N.Y.S.2d 152 (N.Y. App. Div. 1999).  Indeed, if a party misrepresents its intentions to fulfill its obligations under a contract, the party will be responsible for a breach of contract, but not for fraudulent inducement.  *See Gordon v. Dino De Laurentiis Corp.*, 141 A.D.2d 435, 436, 529 N.Y.S.2d 777 (N.Y. App. Div. 1988) (observing that a fraud claim should be dismissed as redundant when the only fraud alleged is that the defendant was not sincere when it promised to perform under the contract); *see also TVT Records v. Island Def Jam Music Group*, 412 F.3d 82, 91 (2d Cir. 2005) (same).  Enzo's claim for fraudulent inducement should be seen (and dismissed) for what it is -- a tort version of its groundless breach of contract claim.[11]

---

[11] In addition, Enzo has not come forward with any evidence of tortious intent on Amersham's part.  In order to sustain a cause of action for fraudulent inducement, plaintiffs must prove "misrepresentation or a material omission of fact which was false and known to be false by defendant."  Lama Holding Co. v Smith Barney, 88 N.Y.2d 413, 421, 668 N.E.2d 1370 (1996); Channel Master Corp. v Aluminium Ltd. Sales, 4 N.Y.2d 403151 N.E.2d  833 (1958).  Because Enzo cannot point to any evidence that Amersham negotiated with Enzo with knowledge and wrongful intent to violate the Agreement, summary judgment is warranted.  Cramer v. Devon Group, Inc., 774 F. Supp. 176, 182 (S.D.N.Y. 1991) ("[E]ven where state of mind is at issue, summary judgment may be proper 'where a plaintiff has failed to make a showing of wrongful intent on the part of the defendant sufficient for a reasonable jury to find for the plaintiff on that issue.'") (citation omitted).  It must also be noted that, even if these allegations were cognizable, and were not time-barred, summary judgment would still be warranted insofar as Enzo's claims are contrary to the merger/integration section of the Agreement.  (*See* Ex. 1 ¶ 22.)

> **b)**     **Enzo's fraud theory belatedly set forth in its discovery response: Amersham's unsuccessful discussions with Yale.**

In discovery responses, Enzo improperly sought to supplement its fraud claim by alleging that Amersham also somehow fraudulently induced it to enter into the Agreement by separately (and unsuccessfully) negotiating with Yale in 1995 concerning a possible license to the Ward patents.  (Ex. 30 (Enzo's Response to Rog No. 5 of Amersham's Second Set of Interrogatories).)  The theory of fraudulent inducement was never properly pled in any iteration of Enzo's complaints, a deficiency that is particularly important because a fraud allegation is subject to Rule 9's heightened pleadings requirements.  *See Eaves v. Designs for Fin., Inc.*, 785 F. Supp. 2d 229, 246 (S.D.N.Y. 2011) (Rule 9(b) applies to a claim for fraudulent inducement).

Even if this theory had been properly pled, it is time-barred.  It is undisputed that the alleged "wrong" in this instance (Amersham's discussions with Yale) took place in 1995.  According to Enzo's own interrogatory responses, "[i]n or about January 1995, Amersham approached Yale University in an attempt to license or purchase the technology under the Ward patents" -- more than six years before Enzo's complaint was filed.  (Ex. 30 (Enzo's Response to Rog. No. 5) at 11.)  Moreover, it is undisputed that Enzo knew of Amersham's negotiations with Yale at least by early October 1999 -- more than three years before Enzo's complaint.  (*See* Ex. 34 (10/7/1999 Letter from Rabbani to Long (AM 005017-24)); Dkt. 1.)  Thus, whether Enzo seeks to invoke the six-year statute of limitations based on the timing of the alleged fraudulent conduct or the two-year statute of limitations based on its discovery of the conduct, the claim is barred under the applicable statute of limitations.

Even if this untimely theory were considered on the merits, there is absolutely no evidence that Amersham ever made any representations to Enzo relating to Yale during their negotiations leading to the Agreement, so there is necessarily no evidence that Amersham made a fraudulent representation, let alone evidence that Enzo relied on that nonexistent

representation.[12]  It is axiomatic that a secret and unexpressed intent on the party of one

contracting party (even if proven) cannot form the basis of a fraudulent inducement claim by the

other party.  Moreover, an additional prerequisite to a fraudulent inducement claim is proof of

injury to the plaintiff stemming from the defendant's conduct.  *Lama Holding Co.*, 88 N.Y.2d at

421; *Channel Master Corp.,* 4 N.Y.2d 403; *Century 21, Inc. v. Woolworth Co.*, 181 A.D.2d 620,

625 582 N.Y.S.2d 101 (N.Y. App. Div. 1992).  Here, it is undisputed that Amersham's

discussions with Yale concerning a possible license were unsuccessful.  It thus follows that there

could have been no injury to Enzo.[13]

### 3.   Amersham is entitled to summary judgment on Enzo's state unfair competition claim (Count III)

Enzo alleges that Amersham engaged in "unfair competition" under New York state law

based on what can only be called unprecedented and legally untenable theories of liability.  Each

theory is meritless, and its belated theory of "unfair competition" -- like the rest of Enzo's tort

claims discussed above -- is barred by the statute of limitations.

### a)   Enzo's unfair competition claim set forth in the Second Amended Complaint:  Amersham's decision not to enter into the amendatory agreement and relationship with ABI

In the Second Amended Complaint, Enzo alleged that Amersham engaged in "unfair

competition" by entering into a settlement agreement with Applied BioSystems, Inc ("ABI") and

conspiring with ABI to not enter a new (or "amendatory") agreement with Enzo.  (*See* Dkt. 70 ¶

74.)  Specifically, shortly after the parties entered into the Agreement, they began to discuss

amending their relationship both to resolve certain of Amersham's concerns and to put to rest

Enzo's threats of litigation over alleged breaches of the Agreement.  (Ex. 14 (AM005727-28);

---

[12] *See High Tides, LLC v. DeMichele*, 88 A.D.3d 954, 957, 931 N.Y.S.2d 377 (N.Y. App. Div. 2011) (fraudulent misrepresentation plaintiff must establish both that defendant made a misrepresentation and plaintiff justifiably relied on that representation).

[13] During the prior summary judgment briefing on this claim, Enzo abandoned its earlier theories of fraud and argued instead that Amersham failed to communicate to Enzo its belief that certain patents were invalid before executing the parties' Agreement, yet communicated such belief to third parties.  This eleventh hour theory -- nowhere disclosed in Enzo's Second Amended Complaint or its discovery responses -- fails as untimely and as deficient as a matter of law for the same reasons as Enzo's other theories.  Moreover, the undisputed evidence shows that Amersham communicated its views concerning patent invalidity -- a belief that was ultimately confirmed at least in the case of the '928 patent -- before entering the Agreement.  (*See* Ex. 10 at E00022588.)

Ex. 15 (AM005729-31); Ex. 16  (AM005713-16).)  However, they were never able to reach final agreement on the provisions of the amendment.  The discussions fell apart in 2001 due to Enzo's continued demands that Amersham cease all research in the area of labeled nucleotides.  (Ex. 17 (8/22/2000 Letter from Fedus to Rollins (E00002286-90)); Ex. 18 (2/27/2001 Letter from Long to Rabbani (AM006001)).)  At or around the same time, Amersham settled what had been protracted litigation with ABI, by entering into a co-development arrangement for the joint development of new DNA analysis technologies.  (Ex. 35 (Article from Goliath website).)

> **(i)**     **Amersham's business decision not to enter into the amendatory agreement with Enzo is not unfair competition.**

Enzo's contention that the parties' unsuccessful negotiations somehow constitutes "unfair competition" on Amersham's part is manifestly baseless.  While Enzo may not agree with Amersham's decision not to sign the amendatory agreement, such action cannot be an actionable commercial activity; indeed, Enzo has cited no legal authority that it is "unfair competition" for one company to decline to enter into a contract with another.  Were Enzo correct, companies would engage in "unfair competition" every day simply for exercising their reasoned business judgment about whether to enter into business arrangements.

Under New York law, a claim of common law unfair competition requires a certain type of nefarious conduct that is not present here: "bad faith misappropriation of a commercial advantage belonging to another by infringement or dilution of a trademark or trade name or by exploitation of proprietary information or trade secrets."  *Eagle Comtronics, Inc. v. Pico Products, Inc.*, 256 A.D.2d 1202, 1203, 682 N.Y.S.2d 505 (N.Y. App. Div. 1998)).  Amersham's decision to not sign an agreement with Enzo is far afield from the conduct contemplated by the common law unfair competition case law.

Moreover, Enzo has not come forward with a single piece of evidence that Amersham conspired with ABI with respect to the decision not to enter the amendatory agreement with Enzo.  *See Knight*, 804 F.2d at 12 (a party cannot rely on bare allegations to defeat summary judgment).  Indeed, there is no evidence that ABI and Amersham ever discussed Amersham's

negotiations with Enzo. Enzo did not even depose or seek documents from ABI to attempt to

support its allegations. Regardless, Amersham decided to not enter into an amendatory

agreement due to the overly constraining terms on which Enzo was insisting, including its

draconian refusal to permit Amersham to engage in research and development, and not because

of anything to do with Amersham's litigation settlement with ABI.[14]

**(ii)    Amersham's purchase of products from PerkinElmer cannot constitute unfair competition.**

Enzo also claims that Amersham engaged in unfair competition by "acting in concert

[with PerkinElmer as successor to NEN] to commit multiple breaches of their respective

distributorship agreements with Enzo." (Ex. 39 and Dkt. 70 at ¶ 41.) This claim is derivative of

Enzo's breach of contract and tortious interference with contract claims. Like Enzo's breach of

contract claim, this claim turns on Enzo's contention that the CyDye technology in question was

subject to the Agreement.[15] And like Enzo's claim for tortious interference, Enzo asserts that

Amersham wrongly purchased and re-sold certain products (*i.e.*, cyanine dye-labeled

nucleotides) from PerkinElmer and that this activity somehow constituted unfair competition.

This theory of unfair competition also fails on the merits for several reasons. First, the

CyDye products that Amersham purchased from PerkinElmer were outside of the Agreement

because the kits and nucleotides at issue are not identified in Exhibit B and are thus not

---

[14] In previous briefing on this issue, Enzo attempted to base its unfair competition claim on alleged patent infringement, stating that "Amersham acted in concert with ABI to continue Amersham's [sale of Cy Dye labeled nucleotides], a misappropriation of Enzo's patent rights." (*See* Enzo's 5/15/2007 Opp. To Amersham Mot. for Summary Judgment at 13.) Once again, the Court has already resolved this issue in Amersham's favor, but regardless, any theory of unfair competition that is premised upon alleged patent infringement is preempted by federal patent law. *See Hunter Douglas, Inc. v. Harmonic Design, Inc.*, 153 F.3d 1318, 1335 (Fed. Cir. 1998) (holding a state unfair competition law claim was conflict preempted because "[i]f a plaintiff bases its tort action on conduct that is protected or governed by federal patent law, then the plaintiff may not invoke the state law remedy, which must be preempted for conflict with federal patent law.") *overruled in part on other grounds, Midwest Indus., Inc. v. Karavan Trailers, Inc.*, 175 F.3d 1356 (Fed.Cir.1999); *see also Eyal R.D. Corp. v. Jewelex New York Ltd.*, 784 F. Supp. 2d 441, 447 (S.D.N.Y. 2011) (dismissing an unfair competition claim for appropriating a jewelry design as preempted under the Copyright Act because "[plaintiff] has simply attempted to dress up its claim that [defendant] has copied its design.").

[15] "Amersham and NEN acted in concert to breach their respective Distributorship Agreements with Enzo. Specifically, Amersham purchased cy dye products from NEN for commercial purposes. Upon information and belief, Amersham induced NEN to breach its Agreement with Enzo by obtaining products (*e.g.*, cy dye products) from NEN that were not authorized under the Enzo-Amersham Distributorship Agreement." (Ex. 30 (Enzo's Resp. to Amersham's Interrogatories) at 11-12 (providing putative basis for unfair competition claim).)

"PRODUCTS" under the Agreement, as explained above.  Second, there is absolutely no
evidence of any "conspiracy" between PerkinElmer and Amersham to breach their agreements
with Enzo or to infringe Enzo's patents.  In fact, as noted above, Amersham's purchase of
cyanine dye-labeled nucleotides from PerkinElmer indisputably predates PerkinElmer's
agreement with Enzo.  Third, the Court has already held that the CyDye products are not covered
by the asserted patents that Enzo alleged that they infringed, a fact that negates Enzo's breach
allegation even under its highly unsupportable interpretation of the Agreement.

> **b)**  **Enzo's unfair competition claim belatedly set forth in its discovery response:  Amersham's unsuccessful discussions with Yale**

While not pled in its Second Amended Complaint, Enzo also belatedly argued that
Amersham's 1995 discussions with Yale also form a putative basis, not only for its fraudulent
inducement claim, but also for Enzo's claim of unfair competition.  (*See* Ex. 30 (Enzo's Resp. to
Amersham's Interrogatories) at 11.)[16]  The undisputed facts show that this claim is time-barred.
In order to determine the statute of limitations for an unfair competition claim, courts typically
analyze the underlying nature of the claim.  *Greenlight Capital, Inc. v. GreenLight (Switz.) S.A.*,
No. 04 Civ. 3136, 2005 WL 13682, at *7 (S.D.N.Y. Jan. 3, 2005).  Where an unfair competition
claim turns on allegations of fraud or surreptitious activity (as Enzo's does here), the applicable
period is the same as the one for claims of fraud (six years from the conduct at issue or two years
from the plaintiff's discovery of it).  *See Stull* 561 F.2d at 432.  Thus, Enzo's 2002 claim for
"unfair competition" based on Amersham's 1995 discussions with Yale, which Enzo
indisputably knew of in 1999, is time-barred.

Even if the Court somehow reached the merits of this unfair competition claim, the
undisputed facts show that it cannot be sustained as a matter of law.  Enzo has never identified
any legal theory that would suggest that it is unfair competition for one company to approach

---

[16] Like Enzo's claim that Amersham breached the "best efforts" provision of the Agreement, this theory of liability
was never pled by Enzo in any iteration of its complaint and so is improper.

another to discuss the possibility of entering into a license agreement, particularly where, as here, nothing came of those discussions and so there could be no possible misappropriation or injury. *See Int'l Flavors & Fragrances, Inc. v. Royal Ins. Co. of Am.*, 46 A.D.3d 224, 231, 844 N.Y.S.2d 257 (N.Y. App. Div. 2007) (tort causes of action require actual injury and damages) ; *Michel Cosmetics v. Tsirkas*, 282 N.Y. 195, 202, 26 N.E.2d 16 (1940) (damages in an unfair competition action are limited to the actual injuries sustained by plaintiff); *see also Police Conference of New York, Inc. v. Metro. Police Conference*, 414 N.Y.S. 748 (N.Y. App. Div. 1979), *aff'd,* 48 N.Y.2d 780 (1979) (dismissing claim under General Business Law for unfair competition based on similar corporate names, because there was insufficient evidence that consumers would confuse the names and because no damages were demonstrated, reasoning "inconvenience or annoyance is not enough.").

### 4.   Enzo's Lanham Act claim (Count IV) fails on the merits.

Enzo claims that Amersham committed unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).  No further specifics or supporting facts were provided for this claim in the Second Amended Complaint.  Enzo's president, Barry Weiner, testified that the allegation was derivative of Enzo's now-failed patent infringement claim -- *i.e.,* that Amersham marketed "products utilizing Enzo technology covered under issued patents" without listing Enzo's patents on Amersham's marketing materials.  (Ex. 36 (Weiner Dep.) at 39).)  Following the close of discovery and for the first time in opposing Amersham's summary judgment motion, Enzo sought to recast its Lanham Act claim as one of "reverse passing off."  (*See* 5/15/07 Enzo Opp. to Joint Summary Judgment Motion at 38-39).)  Leaving aside that it was too late for Enzo to assert a new claim, the recasting does nothing to further Enzo's case, as this claim too is premised on the notion that Amersham was somehow infringing Enzo's patents, an issued that the Court resolved in Amersham's favor in the September 21, 2012 ruling.

Even if the Court's recent ruling had not resolved the question of infringement, it is well settled that conduct violating Section 43(a)(1)(A) must concern the "origin, sponsorship, or approval" of the actual producer of the goods or services giving rise to the claim. 15 U.S.C. §

1125(a)(1)(A); see also *Baden Sports, Inc. v. Molten USA, Inc.*, 556 F.3d 1300, 1306 (Fed. Cir. 2009).  The Supreme Court has held that "origin of goods" under this section of the Lanham Act "does not refer to 'the person or entity that originated the ideas or communications that 'goods' embody or contain.'"  *Id.* (citing *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 32 (2003)).  Rather, "'origin of goods' [refers] 'to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept or communication embodied in those goods.'"  *Id.* (citing *Dastar,* 539 U.S. at 37).  Additionally, any action for false advertising under 43(a)(1)(B) must concern misrepresentations as to "the nature, characteristics, qualities, or geographic origin" of the subject goods or services themselves.  15 U.S.C. § 1125(a)(1)(B); *see also Baden Sports*, 556 F.3d at 1306.  It is uncontroverted that none of the accused products were manufactured by or originated with Enzo.  Nor has Enzo even suggested (nor could it) that Amersham misrepresented the nature, qualities or characteristics of any of the accused products.  Thus, any claim under Section 43(a)(1)(B) concerning the "origin, sponsorship or approval" of the accused goods" or the "nature, characteristics, qualities, or geographic origin" of any of Defendants' goods or services cannot be sustained.  *See id.* at 1307 (plaintiff cannot "fram[e] a claim based on false attribution of authorship as a misrepresentation of the nature, characteristics, and qualities of a good.").

## V.   GRANT OF THE PRESENT MOTION WILL DISPOSE OF ALL OF ENZO'S CLAIMS AGAINST AMERSHAM

A grant of summary judgment in Amersham's favor on Counts I and III-VI will resolve all of the claims in this case.  While Enzo has repeatedly asserted that outstanding issues on its patent infringement claim (Count II) remain, Amersham sought and obtained summary judgment of non-infringement for all products that Enzo timely asserted infringement allegations for (on the schedule mandated by Judge Sprizzo) and that were not subsequently withdrawn.  Moreover, to the extent that Enzo believes that there are additional products that remain to be adjudicated, it has never identified how those products would present different issues of alleged infringement

than those already adjudicated by the Court.[17]  Indeed, Enzo has previously asserted that most of the belatedly accused products were "identical to products already accused of infringement or in the same family."  (*See* Ex. 38 (9/20/2006 Letter from R. Chern to M. Wolf).)

## VI.    CONCLUSION

For the foregoing reasons, the Court should grant Amersham's motion for summary judgment on Counts I and III through VI.

Dated: December 21, 2012                                Respectfully submitted,


                                                        /s/ Maxwell Preston
                                                        Maxwell Preston
                                                        ARNOLD & PORTER LLP
                                                        399 Park Avenue
                                                        New York, NY 10022
                                                        T: 212-715-1000
                                                        F: 212-715-1399

                                                        Matthew M. Wolf
                                                        ARNOLD & PORTER LLP
                                                        555 Twelfth Street, NW
                                                        Washington, DC 20004
                                                        T: 202-942-5000
                                                        F: 202-942-5999

                                                        Jennifer A. Sklenar
                                                        ARNOLD & PORTER LLP
                                                        777 South Figueroa Street, 44th Floor
                                                        Los Angeles, CA 90017-5844
                                                        T: 213-243-4027
                                                        F: 213-243-4199

                                                        *Attorneys for Defendants Amersham plc and Amersham Biosciences*

---

[17] Should Enzo now contend that the belatedly accused products present new issues for adjudication, Enzo would be violating Judge Sprizzo's prior rulings in pursuing such allegations at this late stage, which would likely require an additional Markman and patent summary judgment proceeding.